Filed 10/2/25  P. v. Nevarez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051120 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1553995) |
| v. | |
| ANGEL VILLESCAZ NEVAREZ, | |
| Defendant and Appellant. | |

Adjudicated not guilty by reason of insanity in 2015 on charges of felony indecent exposure, Angel Villescaz Nevarez now appeals from a two-year civil recommitment under Penal Code section 1026.5.[1]  Nevarez argues that substantial evidence does not support the jury's finding that he has serious difficulty in controlling dangerous behavior and that double jeopardy bars any retrial.  Finding substantial evidence supporting the jury's verdict, we affirm the trial court's recommitment order.

## I.    BACKGROUND

### A.    *Nevarez's Commitment History*

In 2015, Nevarez was found not guilty by reason of insanity on two counts of indecent exposure (§ 314, subd. 1) and was committed to the state hospital under section 1026 for a maximum period of four years, subject to extension.  In 2019, Nevarez

---

[1] Unspecified statutory references are to the Penal Code.

was conditionally released into the community for outpatient treatment. But within five months, Nevarez was returned to the state hospital after he "went AWOL in the community" and "used illegal substances."[2]

**B.      *The Recommitment Petition***

In February 2021, the Santa Clara County District Attorney petitioned to extend Nevarez's commitment under sections 1026 and 1026.5 from December 29, 2020, to December 29, 2022. And in March 2023, the Santa Clara County District Attorney again petitioned the court to recommit Nevarez. According to the petition, Nevarez's current commitment term expired on March 21, 2023, and the district attorney sought an extension of his commitment for two years to March 21, 2025. The petition alleged that Nevarez, "by reason of mental disease, defect or disorder, continues to represent a substantial danger of physical harm to others."

Nevarez waived his right to trial on the 2021 petition, and the parties proceeded to a jury trial solely on the 2023 petition.[3]

**C.      *The Jury Trial***

**1.      *Stipulations***

The parties stipulated to the circumstances of Nevarez's January 2015 offenses, in which he masturbated in public while experiencing hallucinations and delusions. The parties also stipulated that Nevarez was involved in an altercation at the state hospital in February 2023, where he grabbed another patient's wrist to get a phone and then trying to strike that patient with the phone.

---

[2] The record reflects that in 2019, the trial court heard an earlier petition to extend Nevarez's commitment. The associated order from the 2019 extension proceeding is not a part of the record in this appeal.

[3] The trial court granted the prosecutor's unopposed motion to consolidate the two petitions, noting "a backup with regards to COVID" during the time in question.

## 2. *The Prosecution's Evidence*

### a. *Dr. Michael Manbeck*

Dr. Michael Manbeck, a senior psychologist specialist at Napa State Hospital, testified as an expert in the diagnosis of mental disorders and the assessment of future risk. Manbeck had treated Nevarez since 2021. According to Manbeck, Nevarez had a current diagnosis of schizoaffective disorder, bipolar type, that was "currently in partial remission," antisocial personality disorder, exhibitionistic disorder, severe stimulant use disorder, severe alcohol use disorder, and severe cannabis use disorder.

Manbeck acknowledged that Nevarez usually got along with peers and staff, but Nevarez also had difficulty taking responsibility for his behaviors and had trouble following rules. When confronted, Nevarez's reactions ranged "[b]etween irritable and angry," occasionally resulting in verbal aggression. One time, Nevarez threw a cup at the medication window. Since being in Manbeck's unit starting in July 2021, Nevarez had been unable to go six months without breaking a hospital rule. Nevarez had limited hospital access because he was "not seen as being able to leave the unit for safety reasons."

In 2020, Manbeck evaluated Nevarez using the Static-99 and STABLE-2007 risk assessment tools, and Nevarez was assessed to have a 59 percent chance of sexually recidivating over the next three years in an outside setting.

Manbeck recounted several incidents in the hospital where Nevarez had broken rules. In October 2021, nursing staff alleged that Nevarez had rubbed against their breasts while he was in the treatment room with them. He also pulled his pants down and showed an area of his groin when asked if he wanted insulin injected. Nevarez previously walked around the unit without a shirt, which was against hospital rules. When this incident was discussed with Nevarez, he denied that it had occurred. In January 2022, Nevarez showed his genitals to a cafeteria staff member. After discussing this incident with Nevarez, he agreed to refrain from such behaviors again. But in

September 2022, Nevarez exposed himself to a female staff member. When asked, Nevarez said he did not want to repeat his behavior but also said that the staff member should not have dressed provocatively.

**b.** *Dr. Sarah Moseman*

Dr. Sarah Moseman, a psychologist at Napa State Hospital, testified as an expert in the diagnosis of mental disorders and assessment of future risk. Moseman was familiar with Nevarez because she was his assigned forensic evaluator and had met him once in March 2023.

Moseman opined that Nevarez had schizoaffective disorder, bipolar type, and in the past had exhibited delusions and hallucinations. Moseman believed that Nevarez presently experienced delusions and paranoia. According to Moseman, Nevarez also had antisocial personality disorder, which was a "pattern of disregard or violation of the rights of others." Nevarez's treatment notes indicated that he continued to be impulsive, irritable, and angry, and that he had been aggressive by threatening and yelling at staff. Nevarez had minimized past incidents and had blamed others for his own behavior—for example, in other incidents of indecent exposure, he blamed the women (including hospital staff) for dressing in a manner he considered provocative. Nevarez had substance use disorder and had trouble controlling his use of illicit substances and alcohol. Moseman opined that Nevarez had exhibitionistic disorder, meaning he was sexually aroused by exposing his own genitals to other adults. Moseman believed that Nevarez's exhibitionistic disorder remained active.

According to Moseman, Nevarez continued to engage in indecent exposure incidents despite being in a highly controlled environment at the state hospital, and he continued to experience psychiatric symptoms of his schizoaffective disorder. In January 2022, Nevarez exposed himself to a female cafeteria staff member. Discussing the incident later with his psychiatrist, Nevarez spread his legs and touched his genitals, telling the psychiatrist that he did not think the staff member would report him. And in

4

September 2022, Nevarez exposed himself to a female staff member, commenting that his blood pressure was high because he was surrounded by beautiful women. Nevarez initially denied the incident then blamed the female staff for being provocative. This type of behavior led Moseman to believe there was a heightened risk that Nevarez would engage in similar conduct again.

In April 2022, Nevarez threw a cup at staff, hitting the metal screen door in the medication room. In October 2022, he threatened a peer by saying that he would " 'knock [him] out.' " And in February 2023, he engaged in physical violence toward a peer, twisting the person's wrist while trying to take away a phone.

Moseman believed that Nevarez was still exhibiting "irritability, violence or aggression" despite being in a highly controlled hospital environment and that in the community without any staff support, monitoring, or medication, the risk of such behaviors would increase. Nevarez struggled with coping skills. When being redirected or educated about his more aggressive incidents, Nevarez would become irritable or not receptive. He also minimized his behaviors and placed blame on others.

Moseman assessed Nevarez using the historical clinical risk management assessment of 20 items (HCR 20) and found that Nevarez was at a "high risk" for "committing acts of violence" should he be released into the community. Nevarez acknowledged that he needed to remain on his medication but was unable to describe how he would do so. And Nevarez maintained that he had been clean and sober for 10 years despite his 2019 use of methamphetamines when in community outpatient treatment. In fact, Nevarez had previously indicated that to obtain treatment or housing in the community, he would relapse on alcohol to become eligible for substance abuse treatment programs. To Moseman, this response indicated that Nevarez minimized his substance abuse and failed to understand how his substance abuse was linked to his future risk of violence and aggression.

Moseman opined that Nevarez did not fully understand his mental illness and needed to gain insight into his diagnoses, further participate in treatment, and learn healthy coping skills before being released into the community. In Moseman's view, Nevarez had difficulty controlling his physical and verbal aggression. Although Nevarez had "better control" of his exhibitionistic tendencies in that he had not exposed himself since the September 2022 incident, Moseman believed that Nevarez would be a risk of danger were he to be released into the community.

### c.    *Dr. Brittany Cunningham*

Dr. Brittany Cunningham, a clinical psychologist at Napa State Hospital, previously saw Nevarez on a day-to-day basis during routine interactions on the hospital floor. In September 2020, Nevarez was with other patients watching a video but was clearly looking at Cunningham instead of the screen, at one point pivoting in Cunningham's direction so that his inner thighs and crotch were facing her. He appeared to be attempting to pull his shorts to the side to expose himself to her. Uncomfortable, Cunningham avoided Nevarez for the rest of his time in that unit.

### 3.    *The Defense*

### a.    *Nevarez*

Nevarez, 62 years old at the time of the trial, acknowledged that he had "schizoaffective and manic depression" and was on medication. Nevarez affirmed that he would continue to take medication should he be released into the community. Nevarez testified that if he were released, he could make use of his experience as a field service representative for a silk screen shop. Asked whether he had been frustrated with the staff at Napa State Hospital, Nevarez answered that he had frustration from an untreated, torn Achilles tendon.

Nevarez acknowledged a prior infraction at the hospital. Nevarez had signed up to use a certain sink to shave but arrived late for his appointment; told by staff to wait, he

instead entered the bathroom to start shaving. Hospital staff eventually "wrestled" him down, pulling the alarm in the process.

### b. *Other Defense Witnesses*

Several witnesses testified on Nevarez's behalf. Ricardo Hernandez volunteered with patients at Napa State Hospital in a 12-step recovery program and had been working with Nevarez for two years. According to Hernandez, Nevarez was presently on the fourth step out of 12 steps. Hernandez would continue to support Nevarez if he was released.

Angela Arevalo, Nevarez's niece, had known Nevarez most of her life. Arevalo and Nevarez communicated two or three times a week by phone or through video meetings. Should Nevarez be released into the community, Arevalo would continue to support him.

Gerhard Haas ministered to individuals at Napa State Hospital and was in contact with Nevarez. If Nevarez were released, Haas believed he could help Nevarez find a spiritual adviser in the community.

### D. *The Verdict and Recommitment Order*

In May 2023, the jury found true that Nevarez had a mental disease, defect, or disorder that causes him to have serious difficulty controlling his behavior, resulting in a substantial danger of physical harm to others under section 1026.5. The trial court ordered Nevarez recommitted to the state hospital for a term of two years from March 21, 2023, to March 21, 2025.

Nevarez timely appealed.

## II. DISCUSSION

### A. *Mootness*

We first address whether the appeal is moot because the recommitment order that is the subject of this appeal expired on March 21, 2025. "A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of

7

plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276.) Thus, Nevarez's appeal is moot unless this court can give Nevarez some sort of effective relief.

Although the Attorney General represents in a supplemental brief that a newer recommitment petition was filed in 2024, with the trial on that petition concluded in July 2025, this 2024 petition is not a part of the record on appeal. And if the new petition resulted in a further extension of Nevarez's commitment, Nevarez could face successive trials to extend his commitment. Additionally, Nevarez's opening brief advances an argument that should the instant petition be reversed for insufficient evidence, double jeopardy bars any subsequent retrial. Although the commitment is civil rather than criminal in nature, "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (§ 1026.5, subd. (b)(7); see also *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 819 (*Hudec*).) Here, Nevarez's double jeopardy argument is supported by the Third Appellate District's decision in *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*), which held that a prosecutor "cannot pursue a second trial to extend a person's section 1026.5 commitment when the first trial resulted in an extension that is later reversed for insufficient evidence." (*Cheatham*, at p. 797.) Under *Cheatham*, a decision by this court that insufficient evidence supports a recommitment petition can afford Nevarez relief as it could arguably preclude any subsequent recommitment trial. (But see *People v. Redus* (2020) 54 Cal.App.5th 998, 1009 [finding appeal moot even when double jeopardy argument was raised when respondent did not address argument in briefing and appellant addressed argument "only in a very general way"].)[4]

---

[4] Although the Attorney General urges us to instead follow *People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477, we note that as discussed in *Cheatham*, the

An appellate court can also "exercise its inherent discretion to resolve an issue rendered moot by subsequent events if the question to be decided is of continuing public importance and is a question capable of repetition, yet evading review." (*People v. Alsafar* (2017) 8 Cal.App.5th 880, 883.) Although here, Nevarez's claims are largely fact-specific and do not particularly raise a question of public importance, it is possible that he may renew the same arguments in future recommitment proceedings. And combined with the possibility that Nevarez could arguably raise a double jeopardy argument in future recommitment proceedings if we were to conclude no substantial evidence supports the current recommitment, we exercise our discretion to address the merits of his claims.

**B.** *Sufficiency of the Evidence*

On appeal, Nevarez challenges the jury's determination that he had serious difficulty controlling his potentially dangerous behavior. (See *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 (*Zapisek*).)[5] But given the testimony provided by three

*Williams* case predated the California Supreme Court's decision in *Hudec*, *supra*, 60 Cal.4th 815. (See *Cheatham*, *supra*, 82 Cal.App.5th at pp. 795–797 [disagreeing with *Williams* and analyzing *Hudec*].) In *Hudec*, the California Supreme Court rejected the *Williams*'s court more restrictive interpretation of the constitutional protections the Legislature intended to codify in section 1026.5, subdivision (b)(7). (*Hudec*, at pp. 827 & 828.) Because, as we will discuss, we conclude substantial evidence supports the jury's verdict in Nevarez's recommitment petition, we express no opinion on whether double jeopardy otherwise applies. We rely on *Cheatham* solely in determining whether to exercise our inherent discretion to consider moot issues.

[5] Nevarez in his opening brief did not dispute the showing that he suffers from a qualifying "mental disease, defect, or disorder." (§ 1026.5, subd. (b)(1).) But for the first time in his reply brief, he argued that it is his diagnosis of antisocial personality disorder that "contribut[es] to his current symptoms making him potentially dangerous" and that antisocial personality disorder cannot properly be the basis of his commitment under section 1026.5. (But see *People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 213 [rejecting argument that antisocial personality disorder is insufficient as a matter of law to warrant an extended commitment and that finding under § 1026.5 is not a question of law but matter for trier of fact to resolve].) As this argument was only raised in Nevarez's reply brief and the Attorney General has not had the opportunity to respond to

psychologists—two of whom treated Nevarez—we find substantial evidence to support the jury's factual finding.

## 1. *Legal Principles and Standard of Review*

A person found not guilty of a felony by reason of insanity may be committed to a state hospital for up to the maximum prison term for the underlying offenses. (§ 1026.5, subd. (a)(1).) But the person may be recommitted beyond this theoretical maximum term for additional two-year terms upon a finding beyond a reasonable doubt that the person "represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (4), (8).) In making this showing, due process requires that the People show that the person has "had serious difficulty controlling his potentially dangerous behavior." (*Zapisek*, *supra*, 147 Cal.App.4th at pp. 1159, 1165; *People v. Galindo* (2006) 142 Cal.App.4th 531, 537 (*Galindo*); see *In re Howard N.* (2005) 35 Cal.4th 117, 132 (*Howard N.*) [concluding that due process requires finding that person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior for commitments under Welf. & Inst. Code, § 1800 et seq.].)

Whether a person is a substantial danger of physical harm to others and has serious difficulty controlling potentially dangerous behavior are factual questions " ' " 'to be resolved with the assistance of expert testimony.' " ' " (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) In reviewing the jury's verdict for substantial evidence, we " ' " 'review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5[, subdivision ](b)(1) beyond a reasonable doubt.' " ' " (*Zapisek*, at p. 1165.) "A single psychiatric opinion that an individual is dangerous because of a mental disorder

---

it, we find it forfeited and decline to reach the merits. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879 (*Bowers*).)

### 2.    *Analysis*

Substantial evidence supported the jury's finding that Nevarez had serious difficulty controlling dangerous behavior.  At trial, Manbeck acknowledged that Nevarez was typically amicable with peers and staff but when confronted with his rule-breaking had a demeanor that was "[b]etween irritable and angry," occasionally rising to the level of verbal aggression.  And even in the hospital's controlled environment, Nevarez continued to engage in the sexual misconduct akin to his commitment offenses—trying to expose himself to his treating psychologist in 2020, rubbing a staff member's breast in 2021, showing cafeteria staff his genitals in January 2022 and exposing himself to another female staff member in September 2022.  Manbeck opined that based on the Static-99 and STABLE-2007 diagnostic tools, he had a 59 percent chance of sexually recidivating in the community should he be released.

There was also evidence that Nevarez's uncontrolled behaviors were potentially dangerous, in that he responded to conflict with aggression.  (Cf. *Cheatham*, *supra*, 82 Cal.App.5th at p. 790 [acknowledging difference between difficulty controlling behaviors as opposed to difficulty controlling *dangerous* behaviors].)  Nevarez had several incidents involving confrontation with peers and staff, not just verbally but physically.  In April 2022, he threw a cup at hospital staff.  A few months later in October 2022, he verbally threatened to assault another patient.[6]  And most recently in February 2023, he twisted another patient's wrist to get a phone and tried to use the phone as a weapon.  And based on the HCR 20 risk assessment, Moseman opined that Nevarez was at a "high risk" for "committing acts of violence" should he be released into

---

[6] We do not suggest that verbal aggression alone is sufficient.  But a reasonable trier of fact may consider verbal aggression as provocative behavior that increases the risk of conflict raising the potential for other failures of impulse control.

the community.  Independent of the HCR 20, Moseman's training and experience left her of the opinion that Nevarez had difficulty controlling his physical and verbal aggression. (See *Bowers*, *supra*, 145 Cal.App.4th at p. 879 [testimony of a single psychiatric expert was sufficient evidence].)  All this is evidence that Nevarez had trouble controlling— even in a controlled environment—his physical aggression toward others.

Nevarez, however, insists that the evidence shows only that he *chose* to engage in potentially dangerous behavior—consistent with his antisocial personality disorder—not that he was *unable* to control it.  He analogizes his case to *Galindo*, *supra*, 142 Cal.App.4th 531.  But *Galindo* is inapposite for two reasons:  first, the recommitment proceedings in *Galindo* preceded the requirement of proof that a person under commitment has serious difficulty in controlling dangerous behavior.  (See *Howard N.*, *supra*, 35 Cal.4th at p. 133.)  Thus, the issue in *Galindo* was not whether substantial evidence supported an inability to control behavior, but whether the failure to consider the new requirement of an inability to control behavior was harmless beyond a reasonable doubt.  (*Id.* at p. 538.)  Second, *Galindo* is factually dissimilar.  In *Galindo*, "[n]o expert opined that defendant's scores on standardized tests, his pursuit of another patient, or any other evidence demonstrates that he tried to control his dangerous behavior but encountered serious difficulty in trying to do so."  (*Id.* at p. 539.)  But in Nevarez's case, there was (1) specific expert testimony on Nevarez's inability to control his behaviors; (2) evidence of specific incidents where Nevarez lashed out at either staff or peers and seemed unable to restrain himself from breaking known rules; and (3) his continued violation of the same rules by the same specific behaviors he had pledged to refrain from. To the extent the risk of an extended commitment did not supply adequate incentive to choose differently, a trier of fact could reasonably infer that Nevarez had difficulty controlling his behavior, not merely that he chose not to do so.

Arguing otherwise, Nevarez points to contrary evidence in the record, such as Manbeck's testimony that Nevarez was typically calm, quiet, and sociable with staff and

peers. But this is not a demonstration of insufficient evidence, this argument instead improperly asks us to reweigh the evidence. (See *People v. Williams* (2015) 242 Cal.App.4th 861, 874.) On appeal, we must view the evidence in the light most favorable to the judgment and evaluate whether a rational trier of fact would have found the requirements under section 1026.5 true beyond a reasonable doubt. (*People v. Williams*, *supra*, at p. 872.) And when there is sufficient evidence to support the jury's finding, our inquiry ends.

In sum, at the time of his trial, Nevarez's behaviors in the state hospital, as well as the opinions of the testifying psychologists, constituted substantial evidence that he had serious difficulty controlling his dangerous behaviors. (See *Zapisek*, *supra*, 147 Cal.App.4th at p. 1166; *Bowers*, *supra*, 145 Cal.App.4th at p. 879.)

### III.   DISPOSITION

The order extending Nevarez's commitment to March 21, 2025, is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

GROVER, J.

*People v. Nevarez*
H051120